**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **AMY J.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 7:17-cv-116** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **NANCY A. BERRYHILL,**[2] | ) | **By: Hon. Robert S. Ballou** |
| **Acting Commissioner of Social Security,** | ) | **United States Magistrate Judge** |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**

Plaintiff Amy J. ("Amy"), proceeding *pro se*, filed this action challenging the final

decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and

therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act

("Act"). 42 U.S.C. §§ 401–433. I conclude that substantial evidence supports the

Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the

Commissioner's Motion for Summary Judgment (Dkt. 20).

**STANDARD OF REVIEW**

This court limits its review to a determination of whether substantial evidence exists to

support the Commissioner's conclusion that Amy failed to demonstrate that she was disabled

---

[1] Due to privacy concerns, I am adopting the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States that courts use only the first name and last initial of the claimant in social security opinions.

[2] Amy originally filed this action against Jeffrey J. Schueler, an administrative law judge. Only "the person holding the Office of the Commissioner shall, in his [or her] official capacity, be the proper defendant." 20 C.F.R. § 422.210(d). Amy has since directed this action against Nancy A. Berryhill, the Acting Commissioner of Social Security.

under the Act.[3] <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it

consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and

alterations omitted). The final decision of the Commissioner will be affirmed where substantial

evidence supports the decision. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Amy filed for DIB on January 9, 2014, claiming that her disability began on December

14, 2013. R. 232–35. Amy's date last insured was December 30, 2017.[4] R. 23. The state agency

denied Amy's applications at the initial and reconsideration levels of administrative review.

R. 104–31. On April 28, 2016, ALJ Jeffrey J. Schueler held an administrative hearing to consider

Amy's claim for DIB. R. 50–89. Amy was represented by counsel at the hearing, which

included testimony from Amy, her attorney, and vocational expert Mark Hileman. <u>Id.</u>

On May 19, 2016, the ALJ entered his decision analyzing Amy's claims under the

familiar five-step process[5] and denying her claim for benefits. R. 23–42. The ALJ found that

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work.  Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience.  <u>See</u> 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[4] Amy must show that his disability began on or before December 30, 2017 and existed for twelve continuous months to receive DIB. 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a).

[5] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. <u>Johnson v. Barnhart</u>, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the

Amy suffered from the severe impairments of multiple sclerosis ("MS"), seizure disorder, obesity, and headaches. R. 25. The ALJ determined that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 28. The ALJ concluded that Amy retained the residual functional capacity ("RFC") to perform a range of light work. R. 21. Specifically, the ALJ found that Amy can: (1) never climb ladders, ropes, or scaffolds; (2) occasionally balance; (3) frequently stoop, kneel, crouch, crawl, and climb ramps and stairs; and (4) only work jobs that do not require her to drive commercially or be exposed to vibration, operational control of moving machinery, unprotected heights, and hazardous machinery. R. 28.

The ALJ determined that Amy was not capable of performing her past relevant work as a hospital cleaner, but could perform her past relevant work as a cashier. R. 40–41. Additionally, the ALJ found that Amy could perform jobs that exist in significant numbers in the national economy, such as marker, garment folder/packager, addressing clerk, and printed circuit board touch up screener. R. 41. Thus, the ALJ concluded that Amy was not disabled. R. 42.

Amy appealed the ALJ's decision, and the Appeals Council denied her request for review. R. 1–4. This appeal followed.

## ANALYSIS

Amy has a history of MS and seizures. Amy was diagnosed with MS at age 21. R. 953. Amy explained that her conditions require her to sit or lay down four or five times per day and she cannot shower or bathe daily. R. 316. Amy stated that she has headaches and constant pain in her neck, back, and legs. R. 341. In her function report, Amy explained that she prepares simple meals, works with her husband to complete chores, spends time talking with friends and family,

---

Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies.  42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

and has difficulty lifting, squatting, bending, standing, reaching, walking, sitting, climbing stairs, using her hands, remembering things, and completing tasks. R. 307–13. At the administrative hearing, Amy testified that she infrequently has large seizures, but has small seizures "once or twice a week." R. 65–66. Amy explained that her MS is in remission, but still causes her to be unable to sit, stand, or control her bowels. R. 67. Amy stated that she can stand for 15 minutes, walk for five minutes, and sit for 20 to 30 minutes. R. 69–71. Amy explained that she has problems lifting items. R. 71.

**Medical Evidence Prior to the Relevant Period**

Before the relevant period, Amy told her primary care physician, David Cummings, M.D., on February 24, 2009 that her MS was under control due to her medications. R. 437. Amy reported frequent headaches that occur almost daily. Id. Dr. Cummings reported that Amy's MS and lab studies were stable, continued her on Elavil for her headaches, and started a trial of Depakote. Id. Amy followed up with Dr. Cummings on May 1, 2009, reporting that she stopped taking her MS medication as she was attempting to become pregnant. R. 793. Dr. Cummings noted that Amy continued to take a diet pill, "which is somewhat incongruent since she is trying to get pregnant at the same time." Id. Dr. Cummings noted that Amy's MS was "quite stable." Id.

**Medical Evidence during the Relevant Period**

Amy was admitted to the emergency room on December 16, 2013 for a seizure. R. 489. Robert E. Salters, M.D., reported that Amy was alert and oriented, but had no memory of the event. Id. Dr. Salters explained that Amy had no prior seizure history, and attributed the seizure to an upcoming surgery which required Amy to fast. Id. Dr. Salters explained that a CT scan showed no "no definite evidence of acute complication for the reported seizure episode." R. 493. Amy underwent surgery to remove an ovarian cyst the next day, and she tolerated the surgery

well. R. 653. Robert L. Slackman, M.D., advised Amy that a temporal lobe lesion could have caused her recent seizure, and that she should follow up with her neurologist. Id. On December 30, 2013, Amy's neurologist, Clement A. Elechi, M.D, explained that her recent seizure could be the result of medication withdrawal or a medication that would lower her seizure threshold. R. 777. Dr. Elechi concluded that Amy could not work due to seizures. Id.

On January 9, 2014, Dr. Cummings recommended that Amy seek disability for her chronic headaches, MS, and seizures. R. 435. Physical, neurological, cardiac, and respiratory examinations returned normal findings. Id.

Amy was admitted to the emergency room on February 6, 2014 for a right-sided headache. R. 730. Amy's husband thought that Amy may have had a small seizure that morning. Id. Physical examination showed normal findings. R. 731–32. Amy was diagnosed with a headache, nausea, and "seizure-like activity." R. 734. Amy was advised to follow up with Dr. Cummings. R. 735. Amy saw Dr. Cummings that same day and had a normal neurological examination. R. 923.

Amy reported seizures in February and March 2014. On February 18, 2014, Amy reported a seizure which prevented her from swallowing, made her feel "shivery," and caused her arms and face to twitch. R. 774. Neurological examination showed normal findings, but physical examination showed difficulty with transfers and an antalgic gait. Id. Dr. Elechi noted no clinical acute exacerbation of Amy's multiple sclerosis and that her seizure workup was negative. Id. An electroencephalogram conducted on February 24, 2014 found no epileptiform activity, but Dr. Elechi noted that the result did not exclude epilepsy. R. 773. On March 2, 2014, Amy was admitted to the emergency room for a reported seizure. R. 748. Physical examination revealed normal findings except for tenderness in the lower quadrant of her abdomen. R. 750.

Amy saw Dr. Elechi the next day, and was prescribed Keppra for her seizures. R. 772. Dr. Elechi

noted that if the seizures continue, Amy will have to see a specialist or go on EMU monitoring.

Id.

Amy followed up with Dr. Elechi on June 30, 2014, denying full seizures but explaining

that she experienced smaller episodes where she felt shaky. R. 814. Amy also reported daily

headaches that she attributed to Keppra. Id. Dr. Elechi noted that Amy's headaches were likely

caused by medication overuse. R. 815. Physical examination showed normal findings. R. 814.

Dr. Elechi noted that Amy has had no seizures since starting Keppra, but that she would

substitute Keppra for Topiramate. R. 815.

Amy went to the emergency room on July 30, 2014 for left leg pain. R. 832. Amy did not

report any injury, and explained that the pain increased with movement. Id. Christopher W.

Allen, PA, explained that Amy's leg pain improved and that she had no remarkable findings on

physical examination. R. 834. Amy was discharged the same day. Id.

Dr. Elechi completed a seizure evaluation form on September 11, 2014, stating that Amy

experienced several large seizures per year and non-convulsive activity several times a week.

R. 840. Dr. Elechi stated that Amy's compliance with medication was satisfactory. R. 841.

Amy followed up with Dr. Cummings on October 10, 2014. Amy's physical and

neurological examinations were normal. R. 866. Dr. Cummings explained to Amy that she could

not drive a car. Id.

Dr. Cummings completed an FMLA form for Amy on November 24, 2014, stating that

she cannot work and could not drive due to seizures and MS. R. 1001.

Amy returned to Dr. Cummings on March 10, 2015, reporting frequent small seizures.

R. 865. Dr. Cummings noted that Amy was being evaluated for a new neurologist because

6

communication with Dr. Elechi had "broken down." Id. Dr. Cummings stated that Amy could

neither work nor drive a car due to her MS and recurrent seizures. Id.

Amy saw neurologist Sean T. Burke, M.D., on April 23, 2015, reporting five to six "bad"

seizures a month which she rated as 9/10 in severity and which lasted for three to four hours.

R. 896. Dr. Burke noted a history of MS and generalized seizures which result in alteration of

consciousness and tongue-biting. Id. Amy wanted to restart Keppra for her seizures. Id. Physical

and mental examinations were normal. R. 898. Dr. Burke noted that Amy's MS was in

remission, and indicated he would alter Amy's medications for MS and headaches should Amy

become pregnant. Id.

Amy saw Matthew Paul Elliot, M.D., for her seizures on April 28, 2015. R. 881. Amy

explained that her large seizures started in 2013 while her smaller, more frequent episodes began

in 2014. Id. Amy stated that her small "spells" cause her to zone out, although she retains

consciousness. Id. Amy stated that these spells last for about one minute, and she is able to "hear

others and is able to speak and respond during these spells without difficulty." Id. Amy stated

that her MS has been "clinically stable without relapse for many years." R. 882. Amy also

reported migraines that occur twice weekly and last for several hours. Id. Physical and

neurological examinations showed normal results. R. 883–84. Dr. Elliot stated that while MS can

cause epilepsy, Amy's reports were not consistent with epilepsy. R. 884. Dr. Elliot stated that he

would treat Amy's spells as though she had epilepsy to be safe. Id.

Amy returned to Dr. Burke on June 18, 2015, reporting two migraines per week as well

as two to three less severe headaches per week. R. 933. Dr. Burke stated that Amy's headaches

are slightly less intense since her Metoprolol was increased. Id. Amy also reported panic attacks

that were alleviated by Xanax. Id. Dr. Burke explained that Amy's MS was stable. Id. Physical

and mental examinations revealed normal findings. R. 936. Dr. Burke prescribed Amitriptyline

for Amy's headaches and continued Tecfidera. R. 937. Dr. Burke explained that he would not

prescribe Xanax, and would leave the treatment of Amy's panic attacks to her primary care

physician. R. 936.

Amy followed up with Dr. Cummings on September 22, 2015, reporting that her

migraine medication was ineffective. R. 918. Physical and neurological examinations revealed

normal findings. Id. Amy saw Dr. Cummings again on December 18, 2015, reporting a recent

seizure. R. 993. Physical and neurological examinations showed normal results. Id.

Amy saw Dr. Burke on March 17, 2016, to get a refill of her seizure medication. R. 969.

Amy reported that she had another seizure-like event on December 5, 2015, which caused her to

shake and then become confused for about an hour. R. 969–70. Dr. Burke mentioned that Dr.

Elliot did not believe that Amy's spells were consistent with epilepsy, but were instead a type of

non-epileptic event. R. 970. Physical examination showed normal findings. R. 972.

Dr. Burke noted that there are two main reasons why an individual with MS would be

unable to work: (1) the individual is cognitively impaired; or (2) the individual suffers from

ambulatory dysfunction. Id. Dr. Burke explained that Amy "does not exhibit any cognitive

impairment that would preclude her from working" and "exhibits no gait difficulty at all." Id.

Amy stated that some days are so bad that she has to "crawl" around her house, but Dr. Burke

noted that individuals with MS "do not fluctuate to such an extent that gait is normal on some

days, alternative with paraplegia on other days. This is simply not consistent with how the

disease affects the spinal cord or higher gait centers." Id. Amy told Dr. Burke that she cannot

work because she cannot drive due to her seizure disorder. Id. Dr. Burke noted that "although not

8

driving makes it difficult to work, it doesn't make working impossible. There are many in the

workplace who use public transportation to make it to work." Id.

Finally, Dr. Burke explained that he has never "gotten involved in a disability claim

where the diagnosis (epilepsy versus non-epileptic events) was uncertain. Having a correct

diagnosis is the first step to ascertaining whether [a] patient is disabled." Id. Dr. Burke concluded

that "[a]bsent a definitive diagnosis, however, I cannot commit to [Amy's] disability claim."

R. 973. Dr. Burke refilled Keppra and continued Tecfidera. R. 972. Amy and her husband were

dissatisfied with the observations of Dr. Burke, who noted that she will likely obtain an

evaluation by a different neurologist. R. 972. Dr. Burke stated that he remained interested in

seeing Amy as a patient, as he believed he could help her. Id.

Amy returned to Dr. Cummings on March 23, 2016, reporting that she was having a

seizure. R. 992. Amy had a blank stare, but her neurological examination was normal with no

focal neurological deficits. Id.

**Medical Opinions**

The record contains several medical opinions regarding Amy's functional capacity. On

July 25, 2012, Dr. Elechi stated that Amy was having more frequent symptoms of MS resulting

in weakness, pain, and difficulty with daily activities. R. 436. Dr. Elechi stated that it is

becoming increasingly difficult for Amy to get to work, and explained that she does not believe

that Amy can hold employment. Id. On January 30, 2014, Dr. Elechi explained that Amy

experiences fatigue and pain due to her MS and migraines. R. 854. Dr. Elechi stated that Amy

cannot climb, lift more than 20 pounds, balance, or be in an unduly warm, bright, or noisy

environment. R. 855.

On May 29, 2014, at the initial level of administrative review, state agency physician Luc Vinh, M.D., explained that Amy can: (1) lift and carry 10 pounds frequently and 20 pounds occasionally; (2) sit, stand, and walk for six hours in an eight-hour workday; (3) frequently crawl, crouch, kneel, stoop, and climb ramps and stairs; (4) occasionally balance and climb ladders, ropes, scaffolds; and (5) never be exposed to hazards such as machinery and heights. R. 113–14. On October 15, 2014, state agency physician Joseph Duckwall, M.D., concurred with Dr. Vinh's opinion at the reconsideration level of administrative review, except he found that Amy can never climb ladders, ropes, or scaffolds. R. 126.

Dr. Cummings completed a medical source statement on June 23, 2015, explaining that Amy could not work due to MS and seizures. R. 917. Dr. Cummings stated that Amy had no lifting restrictions. Id.

On January 16, 2016, Julia L. Ewen, M.D., conducted a consultative examination. R. 953–58. The physical, mental, neurological, and sensory examinations revealed normal findings. R. 955–56. Dr. Ewen noted that Amy walked with a slight limp, but had normal strength in her upper and lower extremities. R. 956. Dr. Ewen diagnosed anxiety disorder, seizure disorder, a history of migraine headaches, and MS "with decreased strength to dorsiflexion of the right foot, and [a] history of intermittent bowel and bladder incontinence as current symptoms." R. 957. Dr. Ewen explained that Amy can: (1) lift and carry up to 20 pounds occasionally; (2) sit for four hours at once and in an eight-hour workday; (3) stand for 10 minutes at one time and for one hour in an eight-work day; (4) walk for five minutes at one time and for one hour in an eight-hour workday; (5) occasionally reach, handle, finger, feel, and push and pull with her upper extremities; (6) never operate foot controls; (7) occasionally balance; (8) never stoop, kneel, crouch, crawl, or climb ladders, scaffolds, stairs, and ramps;

(9) occasionally be exposed to humidity, wetness, vibrations, dust, odors, fumes, and pulmonary irritants; (10) never be exposed to unprotected heights, moving mechanical parts, operation of a motor vehicle, or extreme temperatures; (11) only tolerate quiet environments; (12) never perform activities like shopping, traveling without assistance, walking a block on rough or uneven surfaces, or using standard public transportation; and (13) walk without an assistive device, prepare simple meals, care for her personal hygiene, and sort, handle, and use paper files. R. 960–65.

**Treating Physicians**

The ALJ explained that the record did not contain a persuasive opinion indicating that Amy is more limited than the RFC. R. 38.

A treating physician's opinion which is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record" will receive controlling weight. 20 C.F.R. § 404.1527(c)(2). The ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. Id.; Brown v. Comm'r Soc. Sec. Admin., 873 F.3d 251, 256 (4th Cir. 2017). Further, if the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. § 404.1527(c)(2)–(5). "None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion." Ricks v. Comm'r Soc. Sec. Admin., No.

2:09-cv-622, 2010 WL 6621693, at \*10 (E.D. Va. Dec. 29, 2010) (citing Burch v. Apfel, 9 Fed.

Appx. 255, 259 (4th Cir. 2001) (per curiam)).

The Fourth Circuit reiterated in Monroe v. Colvin that an ALJ must "build an accurate

and logical bridge from the evidence to his conclusion," and the failure to do so is grounds for

remand. 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th

Cir. 2000)). "The failure of an ALJ to specify what treatment history or evidence does not

support a particular opinion means 'the analysis is incomplete and precludes meaningful

review.'" Knapp v. Colvin, No. 7:15-CV-348, 2016 WL 4447836, at \*3 (W.D. Va. Aug. 1, 2016)

(quoting Monroe, 826 F.3d at 191), report and recommendation adopted, No. 7:15-CV-00348,

2016 WL 4482419 (W.D. Va. Aug. 23, 2016). Monroe confirms the ALJ's obligation to explain

the conclusions reached and identify the record evidence which supports those conclusions. Only

then can a court meaningfully review whether substantial evidence supports the ALJ's decision.

The ALJ discussed the opinions of Drs. Cummings and Elechi that Amy cannot work.

The ALJ gave little weight Dr. Cummings's opinion and less weight to Dr. Elechi's opinion. The

ALJ explained that these opinions were not consistent with examinations conducted by both

doctors. R. 38. For example, in March 2015 and December 2013, respectively, both Drs.

Cummings and Elechi stated that Amy could not work due to MS and recurrent seizures. R. 777,

865. The ALJ grounded the decision not to give controlling weight to Amy's treating physicians

on physical examinations performed by both Drs. Cummings and Elechi which consistently

showed normal and unremarkable findings. R. 38. Amy's MS was stable and her seizure-like

condition was never diagnosed as epilepsy. Id. Dr. Cummings frequently reminded Amy that she

cannot drive due to seizure-like symptoms which would not preclude her from work. R. 38. The

ALJ noted the inconsistency between Dr. Elechi's December 2013 conclusion that Amy cannot

work and his January 2014 opinion that Amy could lift and carry 20 pounds but could not work

in certain environments. R. 38–39. The ALJ therefore accorded little weight to Dr. Cummings's

opinions and less weight to Dr. Elechi's opinions. Id.

The ALJ gave less weight to Dr. Ewen's consultative examination, explaining that it

relied "completely" on Amy's subjective allegations of pain and debility. R. 39. The ALJ found

this problematic, as he found Amy's subjective allegations to be inconsistent with the objective

medical evidence. Id. The ALJ explained that Amy's:

> subjective complaints are out of proportion with the weak and
> inconsistent objective medical findings contained in the record.
> The medical records do not support consistent multi-joint
> inflammation, indicated by joint swelling stiffness, redness and/or
> warmth. [Amy] has not exhibited any significant loss of range of
> motion, if any loss was exhibited, at any time since the alleged
> onset date. There is no evidence of reduced grip strength in the
> hands, loss of color in the allegedly affected regions, muscle spasm
> with examination, or muscle atrophy. The medical records also do
> not contain notes that [Amy] exhibited difficulty[ ]initiating
> movement, difficulty moving generally, or muscle tremors. . . .
> [Amy] exhibited an antalgic gait at times when seen by Dr. Elechi.
> However, when seen by Dr. Ewen, [Amy] walked only with a
> slight limp. While exhibiting mildly decreased strength of 4/5 in
> the dorsiflexion of her right foot, an examination was otherwise
> unremarkable. In addition, . . . [Dr. Burke] discussed how [Amy's]
> allegations were inconsistent with her disease process, which
> further diminishes the strength of Dr. Ewen's opinion.

R. 39. The ALJ stated that Dr. Burke provided "extremely detailed reasoning" as to how Amy's

subjective allegations were inconsistent with MS. R. 40. In March 2016, two months before the

ALJ's decision, Dr. Burke stated that individuals with MS are precluded from work either by

cognitive impairment or ambulatory dysfunction, and he explained that Amy suffers from neither

symptom. R. 972. Dr. Burke then stated that Amy's seizure-like episodes were never diagnosed

as epilepsy, and explained how he could not advocate for her disability claim absent a definitive

diagnosis. Id.

I find that substantial evidence supports the ALJ's decision to accord less weight to the

opinions of Drs. Cummings, Elechi, and Ewen. The ALJ sufficiently explained how the opinions

of Drs. Cummings and Elechi were inconsistent with the medical evidence and their own

treatment notes, as Amy was consistently found to be physically and neurologically normal. The

ALJ then explained that Dr. Ewen's consultative opinion was based primarily on Amy's

subjective allegations, the inconsistency of which was highlighted by Dr. Burke's detailed

explanation. Because the ALJ's decision did not rely on "cherry-picked evidence skewed to

contradict [Amy's] doctors," Brown, 873 F.3d at 267, but instead relied on the factors listed in

20 C.F.R. § 404.1527, I find that substantial evidence supports the ALJ's decision.

## **RECOMMENDED DISPOSITION**

It is not the province of the court to make a disability determination. The court's role is

limited to determining whether the Commissioner's decision is supported by substantial

evidence, and in this case, substantial evidence supports the ALJ's opinion. For the foregoing

reasons, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment

and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case Michael F. Urbanski, Chief

United States District Judge, and to provide copies of this Report and Recommendation to

counsel of record.  Both sides are reminded that pursuant to Rule 72(b), they are entitled to note

any objections to this Report and Recommendation within fourteen (14) days hereof. Any

adjudication of fact or conclusion of law rendered herein by me that is not specifically objected

to within the period prescribed by law may become conclusive upon the parties. Failure to file

specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well

as to the conclusion reached by me may be construed by any reviewing court as a waiver of such

objections, including the waiver of the right to appeal.


Entered:  August 13, 2018

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge